## UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | | |
|---|---|---|
| MONA WATSON CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06-CV-00544 |
| v. | ) | |
| | ) | Hon. Marvin E. Aspen |
| INTERNAL REVENUE SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARVIN E. ASPEN, District Court Judge:

On December 16, 2010, we concluded a four-day bench trial on Plaintiff Mona Watson Clark's only remaining claim, Count V of her first amended complaint.  (Dkt. Nos. 47 & 225.) In Count V, Plaintiff alleged that the Defendant, the Internal Revenue Service ("IRS"), made unauthorized disclosures of tax return information pertaining to her great uncle's estate.  (Dkt. No. 47 ¶¶ 87–89.)  Plaintiff is a beneficiary and the current executor of the estate.  What follows are our findings of fact and conclusions of law.[1]

---

[1] In anticipation of trial, Plaintiff submitted a list of 101 exhibits to be introduced as evidence at trial. (Dkt. No. 272.) The IRS objected to the vast majority of these exhibits on relevancy, hearsay, and other grounds. (Dkt. No. 278.) At trial, Plaintiff agreed to withdraw some proposed exhibits, reducing the total number to 81. The IRS renewed its objections to many of the remaining exhibits. The IRS also objected to several aspects of Plaintiff's testimony. The bases for these objections included relevancy, hearsay, and Plaintiff's lack of expertise pertaining to IRS recordkeeping and related matters. Because the trial was not before a jury, we reserved ruling on these objections.

After trial, we allowed the parties to submit briefs on what evidence ought to be considered. Both parties did so. (Dkt. Nos. 297 & 298.) We also permitted the parties to file written objections supported by memoranda. The IRS filed a memorandum outlining numerous objections to Plaintiff's testimony, her expert's declaration and testimony, her proposed exhibits, and her designation of certain deposition transcripts as exhibits. (Dkt. No. 307.)

## I. Findings of Fact

As we indicated in our summary judgment order, the sole issue to be tried in this case was whether the IRS knowingly or negligently made any unauthorized disclosures of tax return information in conjunction with the issuance of an estate tax refund to the beneficiaries of Lewis M. Watson's estate. (9/14/10 Op. at 26–28.) 26 U.S.C. § 7431. At trial, Plaintiff attempted to portray this claim as part of a much broader pattern of mishandling of the estate. Much of Plaintiff's evidence pertained to persons and entities who are not parties to this suit, specifically, Arthur M. Wirtz and his affiliates. We recount it briefly in order to elucidate the context in which this litigation arose.

---

Many of the IRS' objections have merit. Specifically, the IRS is correct that Plaintiff did not identify herself as an expert on IRS matters and yet she purported to testify as such in several instances. (*Id.* at 3–5.) Fed. R. Civ. P. 26(a)(2)(A), 37(c)(1); Fed. R. Evid. 702, 703. The IRS is also correct that in some instances the testimony of Plaintiff's expert was also unreliable. Fed. R. Evid. 702 (requiring expert testimony to be "based upon sufficient facts or data"). Instead of refusing to consider this testimony at all, however, we have admitted it and accorded it what limited weight we think it deserves.

The IRS is also correct that many of Plaintiff's exhibits are irrelevant, contain hearsay, or suffer from other evidentiary deficiencies. To make the record complete, we have considered all of Plaintiff's exhibits. (*See* Dkt. No. 297-1 (outlining all of the exhibits Plaintiff produced at trial).) Most of those that are relevant have little weight. Those that do have weight are identified and referenced in the opinion.

In addition to the 81 exhibits produced at trial, Plaintiff also attached a 195-page appendix to her post-trial brief. (Dkt. No. 310 Appx.) The appendix contains portions of numerous IRS manuals that were not produced at trial. In her post-trial brief, Plaintiff asks us to take judicial notice of these materials. (Dkt. No. 310 at 36.) We decline to do so. We will not sift through 195 pages of material that was not produced at trial and which the IRS had no opportunity to examine. Plaintiff bore the burden of proof at trial, and if these documents were essential to her case, she should have produced them there, where they could have been subjected to the adversarial process.

## A. Background

### 1. Lewis M. Watson's Estate

Plaintiff Mona Watson Clark is the grand-niece of Lewis M. Watson. Watson died on March 13, 1961. (Statement of Agreed Facts ("SAF") ¶ 1.) In his will, Watson created a trust for the residuary property in his estate that was not specifically devised. (Pl.'s Ex. 17 at 4.) Watson named his wife, Marion Watson, as executrix of his estate and trustee of the residuary trust. (*Id.* at 4, 8.) Watson also named one of his business associates, Arthur M. Wirtz, as a successor executor and trustee. (*Id.*) Plaintiff is one of the residuary beneficiaries named in the will.[2] (*Id.*)

According to the estate tax return filed on June 13, 1962, the estate included, among other things, mineral interests in two properties in Jack County and Ward County, Texas. (Pl.'s Ex. 38 at 24.) The estate tax return listed the value of these interests as "nil," because drilling on the Jack County property had yielded "only a trace finding of oil" and "there ha[d] been no interest in or development of" the Ward County property. (*Id.*)

Marion Watson served as executrix of the estate from the time of her husband's death until her own death on August 4, 1963. (12/13/2010 Tr. at 22; SAF ¶¶ 3–4.) Wirtz succeeded

---

[2] Both Plaintiff and Defendant refer almost exclusively to Watson's "estate" and the "executor" of the estate. Watson's will, however, refers to two distinct entities—the estate and the trust—and two fiduciaries responsible for those entities—the executor and the trustee. (Pl.'s Ex. 17 at 2–4, 8.) The will names three individuals—Marion Watson, Charles Watson, and Arthur Wirtz—as possible executors as well as trustees. (*Id.* at 4, 8.) One individual, William Ehrat, is named only as a possible trustee. (*Id.* at 4.) Because of the overlap between the executor and the trustee, as well as the fact that the trust contained the residuary of the estate, the two entities became effectively one and the same over time. Even so, two legal entities remained. Because the parties fail to distinguish between these two entities, however, neither do we except when necessary to do so.

Marion Watson as executor of the estate on December 27, 1963. (SAF ¶ 4.) In 1964, in his capacity as executor, Wirtz made a distribution of estate property in the amount of $37,821.37 to the residuary beneficiaries, including Plaintiff, who was a minor at the time. (Pl.'s Ex. 84.) Until several years later, Plaintiff believed that this distribution was the final distribution of estate property. (12/13/2010 Tr. at 22.)

## 2. Wirtz's Misappropriation of Estate Property

Plaintiff testified at trial that, in 1981, she discovered that Wirtz had been receiving royalties from oil drilling on the Ward County property in which the estate had a mineral interest. (12/13/2010 Tr. at 24–28.) Because Plaintiff believed these royalties to be estate property, she and her fellow beneficiaries hired the law firm of Schiff, Hardin & Waite to obtain them from Wirtz. (*Id.* at 27, 89.)

Ultimately, in 1982, Wirtz made a distribution to the beneficiaries that included $195,808.13 in royalties accrued from December 1980 through August 1981 and $21,244.95 in interest therefrom. (Pl.'s Ex. 20 at 1.) This distribution was part of what was supposed to be the final account of the estate filed with the probate division of the Circuit Court of Cook County, Illinois on November 1, 1982. (*Id.*) On that same day, the estate was discharged, as was Wirtz in his capacity as executor. (Pl.'s Ex. 21.)

Plaintiff admitted at trial, however, that neither she nor the other beneficiaries told the IRS that Wirtz was no longer the estate's executor. (12/13/10 Tr. at 101.) In fact, on January 21, 1983, the IRS received what was marked as the "final" tax return for the estate prepared by Schiff, Hardin & Waite. (*Id.* at 28; Pl.'s Ex. 22 at 1.) The tax return listed "Arthur M. Wirtz, Successor Executor" as the fiduciary of the estate. (Pl.'s Ex. 22 at 1.) The tax return was also

signed by John Milligan, one of Wirtz's associates, on Wirtz's behalf. (*Id.*) A few months later, on July 21, 1983, Arthur M. Wirtz died. (SAF ¶ 6.)

### 3. Issuance of Tax Refund to the Estate

But Wirtz's mishandling of estate property in the manner just described is not the basis for Plaintiff's current claim. Instead, Plaintiff's claim pertains to the IRS' issuance of a tax refund to the estate beneficiaries several years after Wirtz's death. (9/14/10 Op. at 26–28.)

Regarding the refund, Plaintiff testified that, in 1990, she received a call from an attorney at Schiff, Hardin & Waite. (12/13/10 Tr. at 43, 90–91.) The attorney informed her that he had received a check from a Mr. Scranton, who was an attorney for the corporation affiliated with Wirtz's family ("the Wirtz Corporation"). (*Id.*) Plaintiff later testified that the check, which was for the amount of $16,375.95, was payable to the estate of Lewis M. Watson. (*Id.* at 90.) Plaintiff also stated that Scranton delivered the check to Schiff, Hardin & Waite, which then distributed the proceeds to the beneficiaries of the estate, including Plaintiff. (*Id.*)

Plaintiff did not indicate at trial whether she took any action to discover why the estate was receiving a check—from one of Wirtz's affiliates—roughly seven years after the estate's supposed closing and Wirtz's death.

### 4. Plaintiff's Involvement in the Pursue Energy Bankruptcy

Plaintiff's concerns about the estate reemerged in 2003. Around Christmastime of that year, Plaintiff's mother, Virginia Fairfield Clark, who is also a beneficiary of the estate, received a letter from Andrew Glick of the Northern Trust Company. (12/13/10 Tr. at 29.) The letter notified Plaintiff's mother of a proposed settlement agreement between mineral interest owners and Pursue Energy Corporation ("Pursue Energy"), which is an affiliate of the D.H. Hunt

Company.[3] (*Id.* at 29–30.) Plaintiff initially disregarded the letter because she "hadn't been

aware of any property in Mississippi," to which, we infer, the letter referred. (*Id.*) But when

Plaintiff's mother received a second letter regarding a proposed settlement agreement, Plaintiff

began to investigate further. (*Id.* at 30.)

Ultimately, Plaintiff learned from court records that her mother was listed in the matrix of

creditors in a bankruptcy proceeding in Mississippi involving Pursue Energy. (*Id.* at 31.)

Plaintiff then filed a proof of claim on behalf of her mother and the estate beneficiaries in that

proceeding. (*Id.*) Plaintiff was unable to produce documentation supporting her proof of claim,

however. (*Id.* at 31–32.) Plaintiff attributes this failure to Pursue Energy's refusal to produce

information in its possession about her mother's purported claim, despite an order from the

bankruptcy judge to do so. (*Id.*) Although she admitted she "could not prove that he was lying,"

Plaintiff asserted that Pursue Energy's general counsel lied to the bankruptcy judge by stating

that the company had no documentation pertaining to Plaintiff's mother's claim and that the

listing of Plaintiff's mother on the matrix of creditors was a mistake.[4] (*Id.* at 31–32.)

Believing that the listing of her mother's name was no mistake and intent on uncovering

the apparent asset underlying her mother's creditor status, Plaintiff turned to the IRS:

---

[3] Plaintiff's testimony about the letter is not admissible to prove the contents of the letter, as that would be hearsay. Rather, we rely on this testimony only to prove notice to Plaintiff regarding the possibility that her mother or the estate had the mineral interest in question. Through her subsequent investigation, Plaintiff obtained firsthand knowledge of the factual basis—to the extent any existed—for the contents of the letter.

[4] Again, Plaintiff's testimony about what was said in the Pursue Energy bankruptcy proceedings is not admissible to prove the truth of the statements in those proceedings. Instead, we rely on Plaintiff's rendition of these statements to demonstrate the impact of the statements on Plaintiff's state of mind.

> And so I thought, 'Well, what's the logical place to get this information?' Because Wirtz can lie to us, [the D.H.] Hunt [Company] can lie to us, but they are not going to be lying to the IRS. At least, hopefully, they are not going to be lying to the IRS. So I started requesting information from the IRS, so that I could find out what exactly this asset was.

(*Id.* at 32.) This lawsuit grew out of Plaintiff's interactions with the IRS.

## B. Plaintiff's Current Claim

With this expansive backdrop in view, we turn to Plaintiff's remaining claim against the IRS. Despite initially hoping that the IRS would be able to provide her with information about the purported estate asset in Mississippi, Plaintiff has come to believe that the IRS facilitated the mishandling of estate property. Specifically, Plaintiff asserts that the unauthorized disclosure of the estate's tax return information allowed an unknown third party to defraud the estate of a mineral asset in Mississippi through a like-kind property exchange. In Plaintiff's view, all of this activity culminated in the issuance of the refund in 1990.

Plaintiff's primary evidence of the IRS' alleged actions is a series of transcripts generated by the IRS for recordkeeping purposes. These transcripts, which consist of numerical codes, apparently represent actions taken and documents filed with respect to certain taxpayers, specifically, the Watson estate. Because many of the underlying documents are not in evidence, the interpretation of these transcripts is at the heart of Plaintiff's case.

At trial, Plaintiff offered her own interpretation of the transcripts based on her review of IRS publications detailing what the numerical codes in the transcripts signify. Plaintiff also presented the declaration and testimony of Mark Sullivan, a former IRS employee, who claimed to be an expert on IRS matters. At times, Plaintiff's interpretation of the transcripts contradicted Sullivan's. In other instances, Plaintiff drew conclusions from the transcripts that Sullivan was either unable or unwilling to draw. Before addressing whether and to what extent to credit

Plaintiff's interpretation, we first consider Sullivan's.

## 1. Sullivan's Declaration and Testimony

Sullivan was an IRS officer from July 1991 to March 1997.  (11/12/10 Sullivan Dec. ¶ 2.)  For the past twelve years, he has worked in the private sector representing taxpayers in disputes with the IRS.  (*Id.*)  In these roles, Sullivan claims to have become "familiar with the processes and procedures of the [IRS], including interpretation of tax transcripts and retrieving taxpayer information."  (*Id.*)  In interpreting the transcripts in this case, Sullivan relied upon his personal knowledge as well as the Automatic Data Processing / Integrated Data Retrieval System ("ADP / IDRS") Handbooks produced by the IRS.  (*Id.* ¶ 6a.)  These handbooks help explain the numerical codes that appear on IRS transcripts and are updated annually.  (*Id.*)

Sullivan interpreted five transcripts in this case, which were referred to at trial as the 1980 transcript, the 1981 certified transcript, the 1981 transcript, the 1982 transcript, and the "2222" transcript.  (12/13/2010 Tr. at 60, 65, 71, 74–75.)  The first four transcripts correspond to activity associated with the estate's 1980, 1981, and 1982 tax returns.  (3/23/2009 Keys Dec. ¶¶ 5–8.)  The so-called "2222" transcript reflects activity associated not just with a particular year's tax return but with the estate as a whole, such as a change in the estate's name or address.  (11/12/10 Sullivan Dec. ¶ 5a.)

Based on these transcripts, Sullivan offered several conclusions about the IRS' actions with respect to the estate during the 1980s and early 1990s.  Specifically, Sullivan indicated that the IRS received a Form 1041 tax return from the estate for the 1981 tax year on April 15, 1982.  (*Id.* at 5.)  On November 2, 1982, the IRS referred an *amended* tax return from the estate for the 1981 tax year to the Examination Division for an audit.  (*Id.* at 5, ¶ 13b.)  The initial audit was

not complete until February 22, 1984.  (*Id.* at 5, ¶ 13d.)  Whoever was representing the estate before the IRS at that time disagreed with the audit's findings, however, and challenged those findings through the IRS' Appeals Division.  (*Id.* at 5, ¶ 13e.)  On May 29, 1984, the Appeals Division approved a $6,832.09 refund to the estate.  (*Id.* at 5.)

But following the Appeals Division's approval of the refund, the IRS initially failed to issue the refund to the estate.  Sullivan explained that the reason the refund was not issued was that the IRS had "erroneously assessed the [estate's 1980 tax] return as 'late filed'."  (*Id.* ¶ 13g.)  This error caused a penalty to be assessed and a hold to be placed on the estate's IRS account as of June 25, 1981.  (*Id.* ¶¶ 13f–g.)  The erroneous hold remained in place for several years and thus, Sullivan concluded, "that froze issuance of the refund approved in 1984[.]"  (*Id.* ¶¶ 12c, 17b.)

And there things stood with the refund until the twenty-second week of 1988.  (*Id.* ¶ 17c.)  At that time, according to Sullivan, "an unidentified third party purporting to represent the Watson Estate discovered that the 1981 refund had never been issued and filed an unidentified document, possibly a copy of the corrected [1981] return . . . and a Form 843, Claim for Refund" with the Chicago office of the IRS.  (*Id.*)  Before the IRS could take action on the claimed refund, however, the file pertaining to the estate's 1981 tax return—known as a "tax module"—"was dropped to the Retention Register in the [first] week of 1989."  (*Id.*)  Once a tax module "drop[s] to the Retention Register," no transactions, such as the issuance of a refund, can be applied to it.  (*Id.*)  Furthermore, information about the tax module would no longer appear on the estate's master file in the IRS' Integrated Data Retrieval System.  (*Id.*)  In other words, the file for the estate's 1981 tax year had effectively been closed and archived, thus preventing any

further action on it.

In order to remedy the situation, a representative from the IRS' Problem Resolution Program ("PRP") became involved. (*Id.*) PRP representatives "are the IRS' troubleshooters for taxpayers." (*Id.* ¶ 18.) PRP, and its successor organization, the Taxpayer Advocate Service, "do[] not exist to resolve account issues on behalf of IRS personnel unless a taxpayer initiates such assistance[.]" (*Id* ¶ 17c.) Thus, Sullivan concluded that "any PRP involvement with the case would have required discussions/correspondence with a representative of the Estate." (*Id.*) But Sullivan was unable to discern from the transcripts either the identity of this representative or the substance of the hypothesized correspondence.

Regardless, there is evidence that the PRP representative succeeded in bringing the 1981 tax module back from the Retention Register to the estate's master file sometime in 1990. (*Id.* ¶ 17d.) This evidence consists of the transcripts, as well as a Form 5248 that Plaintiff presented as evidence. (*Id.*; 12/14/2010 Tr. at 15.) The Form 5248, which is labeled a "Transfer Request," names the "Lewis M[.] Watson Estate" as the taxpayer and "Arthur M. Wirtz" as the "Successor Exec[.]" (Pl.'s Ex. 30 at 2.) The taxpayer's address appears as "666 Lake Shore Dr[.] [/] Chicago IL 60611[.]" (*Id.*) In the remarks section, the following statement appears: "Bring account back from retention so Cr can be applied from UNID + refunded[.]" (*Id.*) Sullivan explained at trial and in his declaration that the PRP representative used the Form 5248 to bring the 1981 tax module back from retention in order to apply a refund to it. (11/12/10 Sullivan Dec. ¶ 17d; 12/14/2010 Tr. at 15–18.) The PRP representative also apparently located the refund in the Unidentified Remittance File ("UNID"), as evidenced by the reference to UNID in the Form 5248. (12/14/2010 Tr. at 17.) According to Debra Barham, an IRS employee familiar with IRS

procedures, a refund can be sent to UNID when the IRS is unable to identify which taxpayer is entitled to it. (12/15/2010 Tr. at 76.)

In order to issue the refund, however, Sullivan indicated that the PRP representative had to take several actions that are reflected in the transcripts. First, the PRP representative had to lift the freeze on the estate's IRS account. (11/12/10 Sullivan Dec. ¶ 17d.) Next, he or she had to link together two Document Locator Numbers ("DLN") so that the corresponding documents would both be recognized as affiliated with the estate. (*Id.*) Then, the representative had to "manually transfer" a $6,832.00 credit from UNID to the estate's account. (*Id.*) Finally, he or she had to "generate the manual refund . . . and compute credit interest due the Estate from July 26, 1982 to April 17, 1990." (*Id.*) In order to enable this flurry of activity, Sullivan concluded that "the IRS disclosed confidential taxpayer information to an unknown third party who claimed to represent the Lewis M. Watson Estate."[5] (*Id.*)

### 2. Plaintiff's Testimony Regarding the Transcripts

Plaintiff also provided her own interpretation of the transcripts at trial. Plaintiff's interpretation was significantly more elaborate than her expert's in many respects. Specifically, Plaintiff testified that the transcripts demonstrate that (1) a corporate taxpayer was claiming the estate as a subsidiary and that (2) this corporate taxpayer effectuated a like-kind property exchange in 1990 by which the estate was defrauded of a valuable mineral asset. (12/13/2010

---

[5] As indicated below, Sullivan's conclusion that the IRS "disclosed confidential taxpayer information" is not reliable. Debrah Barham, an IRS employee who has reviewed over 11,000 transcripts, testified that it is impossible to discern from the transcripts alone the existence or substance of any possible communications between the IRS and the purported estate representative. (12/15/2010 Tr. at 75–76.) Thus, Sullivan's testimony is not "based upon sufficient facts or data." Fed. R. Evid. 702.

Tr. at 41–42, 60, 71.) And, according to Plaintiff, this scheme would not have been possible without the IRS providing the "pretty exact information" required for a like-kind exchange. (*Id.* at 42.) We consider each of these assertions in turn.

### a. Corporate Subsidiary

At trial, Plaintiff theorized that a corporation was inappropriately claiming the estate as a subsidiary. But Plaintiff's evidence to support this theory is either unreliable, irrelevant, or unsupportive of her position.

First of all, the primary evidence upon which Plaintiff relied for her corporate subsidiary theory is a so-called BMF MCC transcript. This transcript provides information about the entity associated with a particular IRS account number. (*Id.* at 57–58; Pl.'s Ex. 43 at 2; Jackson Dep. at 34–37.) The BMF MCC transcript in this case contains information pertaining to the account number associated with the Watson estate, which is 36-6047424. (Pl.'s Ex. 22 at 1.) Plaintiff testified that this transcript shows "the filing requirements for this particular type of entity," that is, the types of taxes that "had to be paid by this particular type of entity[.]" (12/13/2010 Tr. at 58.) And, in Plaintiff's view, these requirements were "totally inappropriate for an estate." (*Id.*)

In particular, Plaintiff pointed to numbers corresponding to certain types of tax filings in the filing requirements section of the transcript. Summarizing what numbers appear on the transcript and what the corresponding filing requirement is, Plaintiff stated:

> So you have a 940. A 940 is an Employer Annual Federal Unemployment Tax Return. A 941 is an Employer's Quarterly Federal Tax Return. A 943 is an Employer's Annual Federal Tax Return for Agricultural Employees. 945 is Annual Return for Withheld Federal Income Tax. CT1 is an Employer's Annual Railroad Retirement Tax Return . . . [A]nd then they list a 1042 . . . [which is] an Annual Withholding Tax Return for U.S. Source Income from Foreign Persons. So, this is a domestic estate. This is an incompatible filing requirement.

(12/13/2010 Tr. at 59.)  Based on these filing requirements being incompatible with an estate, Plaintiff concluded "that there was a corporation involved, and the corporation was initially filing the estate tax return as a subsidiary."  (*Id.*)

But Plaintiff's interpretation of the BMF MCC transcript is inconsistent with the testimony of Gloria Jackson, an IRS employee familiar with what such transcripts mean. Jackson testified that the 940, 941, 943, and other such codes on the transcript do not mean that the entity would have *had* to file each of those types of returns.  (Jackson Dep. at 36.)  Instead, "those are returns that *can* be filed."  (*Id.* (emphasis added).)  But, as it turns out, the transcript seems to show that no such returns were filed.  Indeed, each of the three-digit numbers is followed by hyphen and a zero in the following manner: "940 - 0", "941 - 0", "943 - 0" and so on.  (Pl.'s Ex. 43 at 2.)  According to Jackson, the zeroes signify that "there were no returns filed under that type [of] return or indication that [that type] would be filed."  (Jackson Dep. at 36.)

We find Plaintiff's interpretation of the BMF MCC transcript unreliable in light of Jackson's testimony.  Although Plaintiff appears to have spent a great deal of time during the past six years teaching herself about the intricacies of IRS recordkeeping, Jackson has worked with the IRS for thirty-five years and currently specializes in researching IRS records.  (Jackson Dep. at 7–8.)  Thus, we credit Jackson's understanding of the transcript as reflecting the types of returns that *could* have been filed by the estate, rather than Plaintiff's assertion that those returns were *required* to be filed.  With this understanding, Plaintiff's charge that the filing requirements associated with the estate demonstrate a parent-subsidiary relationship with a corporate taxpayer

is unfounded.[6]

Plaintiff also claimed that a code "24" next to the letters "SBAO" on the BMF MCC transcript demonstrated that the estate had been assigned to the Small Business Area Office ("SBAO") in Philadelphia.  (12/13/2010 Tr. at 60.)  In Plaintiff's view, this assignment would be unusual for an estate domiciled in Illinois but not so for a corporation incorporated in Delaware. (*Id.*)  To credit this assertion, we would again have to accept Plaintiff's interpretation of the transcript as well as her understanding of IRS procedures.  In light of her lack of expertise on these subjects, we are reluctant to do so.[7]

Plaintiff also testified about how the 1980, 1981, and 1982 transcripts affirm her reading of the BMF MCC transcript.  At trial, Plaintiff explained how unusual activity reflected on the 1980, 1981, and 1982 transcripts "all makes sense" when viewed in light of her corporate subsidiary theory.  (12/13/2010 Tr. at 60.)  By way of example, Plaintiff cited particular DLNs on these transcripts as indicating that certain filings and payments were made in Milwaukee,

---

[6]  Perhaps aware of the inconsistency between Jackson's testimony and her own, Plaintiff attempted to address why the filing requirements were all set to zero in her post-trial brief.  (Dkt. No. 310 at 7.)  There, she asserted that, pursuant to guidelines in the Internal Revenue Manual ("IRM"), the filing of the estate's final return in 1982 caused the filing requirements to be set to zero.  (*Id.*)  But based on the evidence in the record, there is no way to know whether the filing of the final return caused the requirements to be set to zero or whether the requirements had always been set to zero.  Instead, the portion of the IRM Plaintiff cites indicates that "Code 0" corresponds to "tax return not required to be filed," which accords with Jackson's testimony. (Dkt. No. 310, Appx. at 127.)

[7]  In her post-trial brief, Plaintiff cited to the 2003 edition of the ADP/IDRS handbook to confirm the meaning of the SBAO code.  (Dkt. No. 310 at 8.)  But as the IRS correctly pointed out in its response, this document was neither produced at trial nor is it necessarily the appropriate version for interpreting the transcript's meaning.  (Dkt. No. 314 at 17.)  And in any event, the fact that the estate was assigned to the Philadelphia SBAO does not support the significant inferential leap that the estate was being claimed as a corporate subsidiary.

which would be unusual for an Illinois estate.  (*Id.* at 61.)  Furthermore, Plaintiff also pointed to other portions of certain DLNs—specifically, the so-called "blocking codes"—which suggest filings incompatible with an estate.  For instance, Plaintiff pointed to certain blocking codes apparently associated with Federal Unemployment Tax filings in 1980, 1981, and 1982.  (*Id.* at 61–62.)  Plaintiff asserted that such filings are "not consistent with an estate, because the estate had no employees."  (*Id.* at 62.)

But even if we accept Plaintiff's interpretation of these transcripts, which we are reluctant to do in light of its incongruity with Jackson's testimony that no such filings were made, we struggle to see how it affects her current claim.  Indeed, the four filings to which Plaintiff referred occurred in 1980, 1981, and 1982, placing them well outside the relevant time frame for Plaintiff's unlawful disclosure claim.  (Dkt. No. 310 at 10–11; 9/14/2010 Op. at 24–28.)  But even if we consider them, the most that these filings reveal is the possibility that Wirtz was mishandling the estate in the early 1980s by co-mingling estate assets with his personal or corporate assets.  This possible co-mingling explains how these unusual filings might have become associated with the estate in the IRS records.  But standing alone, it does not prove Plaintiff's rather extravagant accusation that the IRS was willingly allowing Wirtz to claim the estate as a corporate subsidiary.

The other evidence upon which Plaintiff based her corporate subsidiary theory also fails to show what Plaintiff says it does.  Specifically, Plaintiff discussed two letters from the Illinois Department of Revenue in her post-trial brief.[8]  These letters indicate that the identification

---

[8]  The IRS rightfully points out that these letters are hearsay and were not properly authenticated at trial.  Plaintiff invokes FRE 807's catch-all exception to the hearsay rule to justify admitting these letters.  (Dkt. No. 297, Ex. A at 4 (citing Fed. R. Evid. 807).)  While we

number 36-6047424 was registered with the state of Illinois as affiliated with the estate of Arthur M. Wirtz. (Pl.'s Ex. 27 at 1–2.) This number, however, was the one that had been used to file the Watson estate's final tax return in 1983. (Pl.'s Ex. 22 at 1.) These letters are consistent with the possibility that Wirtz was co-mingling his own assets with those of the Watson estate in the early 1980s, but they do not demonstrate the existence of a corporate parent-subsidiary relationship. Indeed, the fact that the identification number was registered as an estate bearing Wirtz's name suggests that Wirtz was treating the estate as a personal asset rather than a corporate subsidiary.

Finally, Plaintiff's last piece of evidence supporting her corporate subsidiary theory is in fact not evidence at all. Instead, Plaintiff points to the IRS' failure to produce so-called BMFOL and TXMOD transcripts that she believes exist as demonstrating an attempt to conceal the estate's subsidiary relationship to another corporate entity. (Dkt. No. 310 at 8–9.) But Plaintiff's belief about what these hypothetical documents would demonstrate is highly speculative and, as a result, entirely unreliable. Furthermore, we have already rejected Plaintiff's request for sanctions based on the IRS' behavior in discovery and prior to this litigation. (1/07/2011 Op. at 1.) Drawing the substantial inference Plaintiff now aks us to draw based on the IRS' failure to produce these transcripts would be akin to a spoliation sanction. In light of our prior ruling, we decline to impose such a sanction.

Thus, Plaintiff's evidence does not establish her rather audacious theory that the IRS "allowed a corporate taxpayer to claim [the Watson estate] as its subsidiary." (Dkt. No. 310 at

---

think the applicability of this exception to these letters is dubious, we consider them anyway because they have little effect on our analysis.

3–4.)  At most, Plaintiff has offered evidence of Wirtz's co-mingling of the estate's assets with his own.  But this revelation does little to elucidate whether the IRS, which is the only Defendant in this case, knowingly or negligently violated 26 U.S.C. § 6103 in issuing a tax refund to the estate beneficiaries in 1990.

### b.  Like-Kind Exchange

Building on her corporate subsidiary theory, Plaintiff went on to assert at trial that the estate's corporate parent defrauded the estate of a valuable asset through a like-kind property exchange in 1990.  But Plaintiff's elaborate theory is highly speculative and, in several instances, in conflict with her own expert's testimony.

As evidence of the like-kind exchange, Plaintiff pointed to one of the DLNs on the 1981 certified transcript.  (12/13/2010 Tr. at 44.)  According to Plaintiff, the DLN "09254-507-01304-0 X 1" is noteworthy because of the "X 1" following the thirteen numerals.  (*Id.*)  Plaintiff, apparently through her research into IRS recordkeeping codes, "discovered that that X meant that [the DLN] was a refiled DLN, and that the 1 meant that it was a like-kind exchange, a Form 8824 between related parties."  (*Id*.)  Plaintiff also stated that she believed that this like-kind exchange occurred in 1990, but "was made retroactive to the 1981 tax return."  (*Id.* at 41.)  Making the like-kind exchange retroactive, however, required "that all the income that would have been generated by that asset, between 1981 and 1990 . . . had to be backed out."  (*Id.*)

As the motivation for this elaborate scheme, Plaintiff pointed to some obscured markings next to the DLN on a copy of the 1981 certified transcript she received from Dianna Sproat, an IRS employee.  (Pl.'s Ex. 60 at 5.)  According to Plaintiff, there appear to be the bottom of seven zeroes and one indecipherable digit preceding them just to the right of the DLN.  (12/13/2010 Tr.

at 55.)  Only the bottom of the zeroes appear, however, because the digits have "been partially redacted but not entirely."  (*Id.* at 56.)  Based on her review of certain IRS manuals, Plaintiff asserted that these partially redacted markings are located right where "you should have the liability pending."  (*Id.* at 57.)  Thus, Plaintiff concluded, "before the like-kind exchange, there is a huge, huge liability pending.  And then after the like-kind exchange, it disappears, and there's a refund for [$]16,000."  (*Id.*)

We find this theory wanting in several respects.  Most significantly, it is at odds with the views of Plaintiff's own expert.  As Sullivan stated in his declaration: "The basis for the claimed income reduction and tax adjustment cannot be factually identified."  (11/12/2010 Sullivan Dec. ¶ 13b; *see also* 12/14/2010 Tr. at 17 ("Q.  Okay.  And that 6,800 dollar refund may have been generated by a like-kind exchange; is that your testimony?  A.  *May have.*  Correct." (emphasis added).)  True, Sullivan went on to state that "[i]t is plausible that . . . [a] Like-Kind Exchange, which swapped similar assets of the Estate with a third-party . . . result[ed] in the reduction of [the estate's] taxable income and income tax shown on the [1981] return, thus creating the overpayment (refund)."  (*Id.* ¶ 13c.)  But what is "plausible" and what is more likely than not can be worlds apart.  Furthermore, Sullivan's inability to say with certitude that the transcripts reveal a like-kind exchange stands in stark contrast to Plaintiff's much more definitive conclusion.  Indeed, it would require quite a leap of faith to credit Plaintiff's opinion about the transcripts over that of her own expert.  Thus, we view Plaintiff's conclusion that a like-kind exchange occurred as unreliable.

Plaintiff's contention that the like-kind exchange occurred in 1990 is also at odds with Sullivan's views.  When asked on cross-examination whether the like-kind exchange "that

triggered this refund . . . would have occurred sometime prior to November of 1982," Sullivan responded that it would have.  (12/14/2010 Tr. at 18.)  In addition to having the imprimatur of expertise, Sullivan's dating of the possible like-kind exchange also accords with common sense.  Indeed, Sullivan's analysis requires far fewer unsubstantiated inferences than Plaintiff's much more baroque theory about "back[ing] out" years worth of inappropriate activity.

Finally, Plaintiff's explanation for the motivation behind this purported like-kind exchange stands on very shaky evidentiary grounds.  As an initial matter, it is difficult to discern anything, let alone the bottom of an eight-digit number, from the stray markings Plaintiff cites on the 1981 certified transcript provided by IRS employee Diana Sproat.  And even if we assume that these markings are the bottom of an eight-digit number, Plaintiff's contention that this number represents a huge liability pending requires us to rely again upon her postulations.  If she is so confident in this conclusion, why is her expert silent on the matter?  Furthermore, relying on common sense, it would be strange indeed to see an eight-digit tax liability in which seven of the digits are zeroes.  Although not impossible, one would not ordinarily expect such a flat figure to result from the precise accounting that is required to assess tax liability.  And in any event, if someone had the motive to conceal this huge number by redacting it, one would think this person would have also had the motive to do a more thorough job.  Thus, we must also reject this component of Plaintiff's like-kind exchange theory.

### c.  IRS Involvement

The final inference Plaintiff drew from the transcripts was that the IRS helped facilitate the supposed like-kind exchange by providing information to the party claiming to represent the estate.  We find that this inference is not supported by the evidence.

Plaintiff testified at trial that the IRS had to have made unauthorized disclosures to whoever was effectuating the like-kind exchange, because the transaction would not have been possible without the "pretty exact information" required "to pull it off[.]" (12/13/2010 Tr. at 42.) As Plaintiff summarized:

> I believe there was a like-kind exchange that occurred in 1990, and it was made retroactive to the 1981 tax return . . . And, essentially, what happened was if there's a like-kind exchange, you have two like-kind properties being exchanged supposedly. But the Ward County property, that was in the estate and held by—given to the beneficiaries has always been owned by the beneficiaries. So, there was nothing happening except a sham setup to transfer an asset out of the estate without the beneficiaries' knowledge. And I believe that the IRS had to participate by providing all the account balances, all the penalties that would have been assessed, all the interest that would have been assessed.

(*Id.* at 41–42.) Indeed, in her post-trial brief, Plaintiff went on to boldly assert that the IRS—specifically, "[t]he PRP tax examiner"—colluded with the "corporate taxpayer" to "devise[] a scheme through which the Watson Estate would be given the Ward County property, which it already owned . . . in exchange for the undisclosed property." (Dkt. No. 310 at 29.) In facilitating this sham transaction, the IRS "revealed confidential tax information, which allowed a third party to steal the Watson Estate's identity and claim the assets of the Watson Estate as its own." (*Id.*)

But the evidentiary gaps in this theory are myriad. As indicated above, the premise of Plaintiff's theory is faulty in that the existence and timing of the like-kind exchange are very much in doubt. Furthermore, regarding the IRS' role in the supposed like-kind exchange, Plaintiff's expert stated that the IRS' usual role in a like-kind exchange is to determine the tax consequences after the exchange has already happened. (12/14/2010 Tr. at 19.) But Plaintiff's theory, by contrast, maintains that the IRS fed information to parties beforehand to enable the

supposed like-kind exchange. In order to accept this theory, we would have to assume that the IRS had done far more than make unauthorized disclosures. We would have to infer that the IRS was involved in a conspiracy to defraud the estate. As we are well beyond the motion to dismiss stage, Plaintiff's weighty accusation of bad intent is only entitled to the weight that the evidence supports. In support of this accusation, Plaintiff has only offered her own interpretation of the transcripts, which we have already determined to be largely unreliable, and rank speculation. Absent more, we conclude that Plaintiff's theory of the IRS willfully disclosing information to facilitate a like-kind exchange is unfounded.

### 3. Summary of Findings

The evidence in this case is scant, and that which does exist is cryptic. In attempting to explicate and fill in the gaps in this evidence, Plaintiff has offered a highly speculative theory about the IRS' supposed misdeeds. Having considered and rejected much of this elaborate theory, we turn to what can be extrapolated from the evidence. Viewing the evidence in a neutral light free of the conspiratorial hue Plaintiff imposes upon it, there is nothing suspect about the IRS' actions in conjunction with the issuance of the 1990 refund.

As an initial matter, the process that ultimately led to the issuance of the refund in 1990 appears to have been initiated by someone well aware of the estate's affairs, including the existence of the refund. As Sullivan testified, PRP, which helped facilitate the issuance of the refund, would most likely have become involved in the estate's affairs at the request of someone from outside the IRS. (11/12/10 Sullivan Dec. ¶ 18.) Sullivan further testified that the person seeking the refund would have likely initiated the process through the filing of certain documents, specifically, a corrected copy of the estate's 1981 tax return. (*Id.* ¶ 17c.) Any

person in possession of such documentation would have already known a great deal about the estate and its assets.

Neither Sullivan nor Plaintiff could identify who this person was, however. It is possible that this person may have been affiliated with Wirtz. After all, the refund check was initially presented to the estate's attorney by Scranton, an attorney affiliated with the Wirtz Corporation. (12/13/10 Tr. at 43, 90–91.) We also know that there was no executor of the estate at this time due to Wirtz's ouster and subsequent death.

But even assuming that the person interacting with the IRS was affiliated with Wirtz, the IRS had no notice that Wirtz was no longer authorized to act on the estate's behalf. Indeed, the Form 5248 used to bring the 1981 tax module back from retention indicates that, based on the information in its records, the IRS was under the impression that Wirtz was still the successor executor of the estate in 1990. (Pl.'s Ex. 30 at 2.) Plaintiff argues that the fact that the estate's 1982 tax return had been labeled as final should have notified the IRS that Wirtz was no longer entitled to act on the estate's behalf. We disagree. The 1982 tax return, which was filed on January 21, 1983, still lists Wirtz as the fiduciary and "Successor Executor" of the estate. (Pl.'s Ex. 22 at 1.) Plaintiff also admitted on cross-examination that, to her knowledge, no one notified the IRS of Wirtz's ouster as executor or of his subsequent death. (12/13/10 Tr. at 101.) Absent notice to the contrary, the IRS would have had no reason to know that Wirtz and, by extension, his representatives were no longer entitled to obtain information about the estate.

## II. Conclusions of Law

Plaintiff brings her claim against the IRS pursuant to 26 U.S.C. § 7431, which provides a cause of action for the unauthorized disclosure of tax return information. The IRS asserts that we lack jurisdiction over Plaintiff's claim because she failed to comply with Section 7431's statute of limitations. In the event we do have jurisdiction, the IRS asserts that Plaintiff failed to prove the elements of her claim at trial. We agree with the IRS in both respects.

### A. Statute of Limitations

The IRS contends that we lack jurisdiction over Plaintiff's claim based on the statute of limitations in 26 U.S.C. § 7431(d). Section 7431(d) states as follows:

> [A]n action to enforce any liability created under this section may be brought . . . at any time within 2 years after the date of discovery by the plaintiff of the unauthorized inspection or disclosure.

26 U.S.C. § 7431(d). In most instances, a statute of limitations serves as an affirmative defense that, like other affirmative defenses, must be proven by the party asserting that defense during a determination of the merits of a case. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133, 128 S. Ct. 750, 753 (2008). But in *Aloe Vera of America, Inc. v. United States*, the Ninth Circuit determined that Section 7431(d) limits the scope of the government's waiver of sovereign immunity. 580 F.3d 867, 871 (9th Cir. 2009). As such, the statute of limitations is "jurisdictional" and "we cannot rule on the merits of the case unless the action was timely filed." *Id.* at 872. And as is the case with jurisdiction, the party asserting jurisdiction has the burden of proving it. *Kingman Reef Atoll Investments, L.L.C. v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008). In this case, that burden rests with Plaintiff.

The Ninth Circuit in *Aloe Vera* also specified when Plaintiff 's claim must have been

brought for us to have jurisdiction.  As the Court held: "[A]n action pursuant to section 7431(d) must be filed within two years of the date of discovery of the supposedly improper disclosure, not the date when the plaintiff realizes that a disclosure was unauthorized."  580 F.3d at 871.  Later in the opinion, the Court further elaborated that "the statute begins to run on the date on which a plaintiff discovers that the allegedly unauthorized inspection or disclosure has taken place, regardless of whether the plaintiff believed at that time that the inspection or disclosure was authorized."  *Id.* at 873.

Based on this determination, the Ninth Circuit reversed and remanded the case to the District Court.  *Id.*  It did so because the District Court had merely accepted as true the allegation in the amended complaint the plaintiffs "did not discover the unauthorized disclosures . . . [until after] a disclosure order . . . in a Freedom of Information Act [FOIA] suit."  *Id.* at 872.  The Ninth Circuit instructed the District Court on remand to make factual findings "regarding the dates on which [the plaintiffs] discovered the respective disclosures underlying each of [their] claims."  *Id.* at 873.

On remand, the District Court made several findings with respect to the various plaintiffs and the two counts of unauthorized disclosure at issue.  *Aloe Vera of America, Inc. v. United States*, 730 F. Supp. 2d 1020 (D. Ariz. 2010).  The District Court dispensed with the first count by granting summary judgment against some plaintiffs and dismissing for wont of jurisdiction against the remaining plaintiffs.  *Id.* at 1026–28.  That count dealt with allegations that the United States tax authorities had intentionally provided false information to their Japanese counterparts in the course of a joint investigation of the plaintiffs.  *Id.*

The second count in *Aloe Vera*, which is more relevant to this case, dealt with whether

the United States was negligent in disclosing the plaintiffs' United States tax return information

to the Japanese authorities. *Id.* at 1022. The plaintiffs contended that the Japanese authorities

regularly failed to maintain the confidentiality of such information and, in their case, had leaked

the information to the press. *Id.*; 580 F.3d at 870. With respect to the second count, the District

Court found on remand that it lacked subject matter jurisdiction as to all the plaintiffs because of

the plaintiffs' failure to comply with Section 7431's statute of limitations. 730 F. Supp. 2d at

1032.

       The Court reached this holding based on its conclusion that all the plaintiffs were on

"inquiry notice" that disclosures were occurring once they learned of the joint investigation

between the United States and Japan. *Id.* at 1030–31. The plaintiffs admitted that they had

initially learned that the United States tax authorities were communicating with the Japanese tax

authorities about the plaintiffs' tax filings in August 1996. *Id.* at 1032. The plaintiffs contended,

however, that they did not know the substance of these communications—that is, what the

United States authorities disclosed to the Japanese—until they received information pursuant to

a FOIA request in August 1998. *Id.* at 1030, 1033 n.8. The plaintiffs subsequently filed their

unauthorized disclosure suit in October 1999. *Id.* at 1022. The District Court rejected the

plaintiffs' theory that the post-FOIA request date was the relevant one. It did so because it

reasoned that adopting the plaintiffs' theory would have allowed the plaintiffs to "potentially

wait[] fifty years," "file[] a FOIA request," "discover that one particular document was

disclosed," and then file suit. *Id.* at 1031. To allow such an outcome would, in the District

Court's view, violate the principle that waivers of sovereign immunity such as Section 7431

ought to be strictly construed. *Id.* at 1031–32. Thus, the District Court found that it lacked

jurisdiction over the plaintiffs' second unauthorized disclosure count, because the plaintiffs should have known disclosures were occurring as of the date they learned of the joint investigation.  *Id.* at 1032.

We dwell on *Aloe Vera* because it has significant implications for this case.  The IRS, following the "inquiry notice" theory adopted by the District Court in *Aloe Vera*, urges us to find that Plaintiff "knew or should have known" of the disclosures in this case as of her receipt of the refund check via the Wirtz Corporation's attorney in 1990.  (Dkt. No. 309 at 19–22 (citing *Aloe Vera*, 580 F.3d at 872 and *Aloe Vera*, 730 F. Supp. 2d at 1031).)  The IRS suggests that this theory accords with the usual rule for federal claim accrual as stated by the Ninth Circuit in the § 1983 context: "A federal claim accrues when the plaintiff 'knows or has reason to know of the injury which is the basis of the action.'"  *Bagley v. CMC Real Estate Corp.*, 923 F.2d 758, 760 (9th Cir. 1991).  The IRS argues that, to the extent it was making disclosures of the estate's return information to a Wirtz affiliate after Wirtz's executorship, Plaintiff knew or should have known of these disclosures when she received the refund check from Scranton, the Wirtz Corporation attorney, in 1990.  (*Id.* at 20–22.)  Thus, because Plaintiff did not file her unlawful disclosure claim until 2006, the IRS contends that the claim is time barred and we lack jurisdiction.

In response, Plaintiff argues that she "did not know and had no reason to suspect that Defendant made unauthorized disclosures until after she received transcripts from [the IRS] in 2005."  (Dkt. No. 315 at 10.)  She further contends that "Plaintiff's injury was not the refund," and "that the refund gave no indication that a like-kind exchange was processed."  Without knowing of the like-kind exchange, Plaintiff did not know of what she perceives to be the injury

in this case. (*Id.*)  Plaintiff further contends that it is "untenable" to view the issuance of the refund in 1990 as putting her on notice. (*Id.* at 11.)  She says that adopting such a view would require Plaintiff "to have known that the refund was the result of an unknown third party communicating with the IRS, negotiating with the IRS, persuading the IRS that the estate was a corporate entity, and ultimately persuading the IRS to recognize an unlawful like-kind exchange." (*Id.*)

We agree with the IRS that Plaintiff had notice of her claim for statute of limitations purposes as of receipt of the refund check in 1990.  In our view, Plaintiff's receipt of the check from the Wirtz Corporation attorney gave her not merely inquiry but actual notice of at least one disclosure—namely, the check itself—as of 1990.  We further conclude that the receipt of the refund check from Scranton should have alerted Plaintiff that other disclosures may have occurred in generating the refund.  Because Plaintiff failed to bring her unauthorized disclosure claim within two years of receipt of the refund check, we have no jurisdiction over this claim. *Aloe Vera*, 580 F.3d at 871.

We reach this conclusion for several reasons, both factual and legal.  We first recount the factual reasons why Plaintiff should have known that the IRS had made disclosures of the estate's return information to an unauthorized third party, if it in fact did, as of 1990.  At trial, Plaintiff testified about when she first learned that the IRS was communicating about the estate to one of Wirtz's affiliates even after Wirtz's executorship had ended and he had died.  The following exchange between Plaintiff and her attorney occurred on direct examination:

Q.   You are not aware of any of these activities with respect to the estate until when?

A.   I wasn't aware of anything until 1990, when I got a call, I believe, from a Garry Hodgman with S[c]hiff Hardin & Waite.  And he said that he had gotten a check

> for [$]16,000 and, I believe, $3,745. And he had received it, he said, from
> Scanton, who was the attorney for Wirtz corporation.

(12/13/2010 Tr. at 43.) Roughly seven years prior to this date, in 1983, Plaintiff had succeeded

in ousting Wirtz as executor of the estate after she discovered that he had misappropriated over

$200,000 in royalties belonging to the estate. (*Id.* at 26–28.) The law firm Schiff, Hardin &

Waite had represented her in that matter. (*Id.*) Plaintiff also stated that she knew that the

estate's final tax return had been filed and received by the IRS on January 21, 1983. (*Id.* at 28;

Pl.'s Ex. 22 at 1.) Plaintiff knew that the Illinois probate court had closed the estate and

discharged Wirtz as the executor as of November 1, 1982. (*Id.* at 28; Pl.'s Ex. 21.) And yet,

despite her contentious history with Wirtz, Plaintiff appears not to have done anything about the

fact that, seven years after Wirtz ceased to be executor, the IRS sent a refund check for the estate

to an attorney affiliated with Wirtz. Indeed, Plaintiff did not bring this suit against the IRS until

sixteen years later on October 4, 2006. (Dkt. No. 1.)

In light of these facts, we conclude as a matter of law that Plaintiff knew or should have

known of the injury for which Section 7431 provides a remedy as of 1990. *See, e.g.*, *Venen v.*

*United States*, 38 F.3d 100, 106 (3d Cir. 1994) ("Section 6103 and its attendant damages

provision, [S]ection 7431, were meant to regulate only one sphere of activity—information

handling[.]") Section 7431 allows a "taxpayer" to bring a cause of action against the United

States when any "officer or employee of the United States knowingly, or by reason of negligence

. . . discloses any return or return information with respect to [such] taxpayer in violation of any

provision of [26 U.S.C.§] 6103[.]" When Plaintiff received the refund check from the Wirtz

Corporation attorney, she had actual notice of at least one disclosure as defined by Section 6103.

That disclosure was the check itself and the information contained therein.

Section 6103 provides that tax returns and return information must be kept confidential, subject to certain exceptions. 26 U.S.C. § 6103(a). Section 6103 defines the "return information" that must be kept confidential as including:

> a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense[.]

26 U.S.C. § 6301(b)(2)(A). In this case, the check would have conveyed "data . . . prepared by . . . the Secretary with respect to a return," namely, the amount of the refund for the 1981 return. Until the IRS tabulated this refund and wrote the check, no one outside the IRS would have known the exact amount. The IRS' transmission of the check would thus have been a disclosure of "return information" within the meaning of Section 6103. Once Plaintiff learned that Scranton had received the check, she had actual notice that a disclosure had occurred. *Aloe Vera*, 580 F.3d at 873.

We also find that Plaintiff's discovery of the fact that Scranton had received the refund check in 1990 put her on inquiry notice of any disclosures prior to the issuance of the refund check. *Aloe Vera*, 730 F. Supp. 2d at 1031; *see also McQueen v. United States*, 264 F. Supp. 2d 502, 509 (S.D. Tex. 2003), *aff'd*, 100 Fed. Appx. 964, 2004 WL 1284210 (5th Cir. June 10, 2004) ("The date of discovery, under § 7431(d), is when one knows or should have known of the claim."); *Amcor Capital Corp. v. Untied States*, No. 94-6814, 1995 WL 515690, at *2 (C.D. Cal. June 13, 1995), *aff'd*, 106 F.2d 406, 1997 WL 22248 (9th Cir. Jan. 15, 1997) (holding that statute of limitations in § 7431(d) "begins to run from the date upon which the plaintiff knows or should

have known of the subject injury").  The IRS is not known for spontaneously issuing tax refunds seven years after a tax return is filed.  A refund, especially one seven years delayed, usually comes from someone seeking it.  Indeed, Plaintiff's whole theory of the case at trial was that the refund would not have happened but for someone purporting to be a representative of the estate communicating with the IRS.  (12/13/2010 Tr. at 14.)  In the same way that the investigation in *Aloe Vera* should have signaled those plaintiffs that disclosures had possibly occurred, Plaintiff's receipt of the refund check via Scranton should have alerted her to the fact that someone, perhaps Scranton, had been communicating with the IRS about the refund and, by extension, the estate.

Plaintiff's argument that she did not know the specifics of what may have been disclosed—which she contends is information about a like-kind exchange—until she started seeking information from the IRS is analogous to the plaintiffs' position in *Aloe Vera*.  There, the plaintiffs argued that, until they received information pursuant to a FOIA action, "they did not know on an item by item basis what was disclosed[.]"  730 F. Supp. 2d at 1030.  The District Court rejected this argument because it would have allowed the plaintiffs to "potentially wait[] fifty years," "file[] a FOIA request," "discover that one particular document was disclosed," and then file suit.  *Id.* at 1031.  Substituting sixteen years for fifty, that is essentially what happened in this case.  Once Plaintiff knew that the IRS was still sending return information—a check, no less—to a Wirtz affiliate seven years after Wirtz's ouster as executor and subsequent death, she should have either alerted the IRS or brought this suit.  Because she failed to do so, we lack jurisdiction over her claim.  *Aloe Vera*, 580 F.3d at 872.

Plaintiff's sixteen years of inaction reveals a key insight about the broader context of this

case.  If Plaintiff's chief concern were actually the IRS's handling of confidential information—which is what Sections 6103 and 7431 regulate—her sixteen years of inaction would be inexplicable to a reasonable person.  But through this suit, Plaintiff is actually seeking to remedy misdeeds perpetrated by Wirtz and his affiliates, not the IRS.  Plaintiff's characterization of the injury in this case as the like-kind exchange demonstrates how she is attempting to use a Section 7431 claim to get at a harm that was done to her, if at all, by Wirtz and his affiliates.  But even if the IRS did disclose the information Plaintiff alleges, it could not and did not cause this transaction to occur, assuming such a transaction did occur.  As Plaintiff's own expert admitted on cross-examination, the IRS' role in any such transaction would merely have been to assess the tax consequences after the fact.  (12/14/2010 Tr. at 19.)  But as numerous courts have confirmed, "[w]e will not, under the guise of a § 7431 action, inquire whether the tax assessment . . . [was] proper."  *Bleavins v. United States*, No. 92-3222, 1993 WL 265116, at * 2 (7th Cir. July 16, 1993); *see also Huff v. United States*, 10 F.3d 1440, 1447 (9th Cir. 1993); *Wilkerson v. United States*, 67 F.3d 112, 116 (5th Cir. 1995); *Venen v. United States*, 38 F.3d 100, 106 (3d Cir. 1994).  Thus, Plaintiff's characterization of the injury in this case fails in fact and in law.

Our conclusion that we lack jurisdiction over Plaintiff's claim is in keeping with the Ninth Circuit's understanding of Section 7431's statute of limitations in *Aloe Vera*.  As the Court stated in that case: "[T]he structure of section 7431 indicates that Congress intended the limitation period to restrict the scope of the government's waiver of sovereign immunity."  *Id.* at 871.  The Court went on to observe that Section 7431's statute of limitations "is absolute" and is not subject to the "equitable tolling or waiver" that might otherwise limit its effect.  *Id.* at 872.

Given this robust reading of the applicable statute of limitations, it would be an odd result indeed to allow Plaintiff to seek $78,000,000 in damages from the IRS based on disclosures she knew or should have known about sixteen years prior to bringing suit. (12/13/2010 Tr. at 83.) We decline to do so.

### B. Elements of Plaintiff's Section 7431 Claim

In the event we have jurisdiction, we also draw the following conclusions of law based on our consideration of the merits of Plaintiff's claim at trial. Of course, the legal effect of these conclusions is contingent on our jurisdiction. Absent such jurisdiction, these conclusions are moot.

At trial, Plaintiff attempted to prove by a preponderance of the evidence that the IRS: (1) made a disclosure of a return or return information; (2) that the disclosure was unauthorized in violation of Section 6103; and (3) that the disclosure was made negligently or knowingly. *Aloe Vera of America, Inc. v. United States*, 580 F.3d 867, 870–71 (9th Cir. 2009). Plaintiff failed to meet her burden of proof.

### 1. Whether Any "Return Information" was "Disclose[d]"

In order to sustain the first element of her claim, Plaintiff must prove that the IRS "disclose[d]" a "return or return information." 26 U.S.C. § 7431(a). Each of these phrases has a particular statutory definition as set forth in Section 6103. Section 6103 defines a "disclosure" as "the making known to any person in any manner whatever a return or return information." 26 U.S.C. § 6103(b)(8). Several courts have interpreted the phrase "the making known" as requiring the imparting of information to a person to whom that information was previously unknown. *See Brown v. United States*, 755 F. Supp. 285, 287 (N.D. Cal. 1990); *Elias v. United*

*States*, No. CV 90-0432, 1990 WL 264722, at *7 n.14 (C.D. Cal. Dec. 21, 1990), *aff'd by* 974 F.2d 1341 (9th Cir. 1992); *Haywood v. United States*, 642 F. Supp. 188, 192 (D. Kan. 1986); *Pflum v. United States*, No. 99-4170, 2007 WL 1651290, at *6 (D. Kan. June 6, 2007); *Calhoun v. Wells*, No. 79-2337-2, 1980 WL 1637, at *3 (D.S.C. July 30, 1980) ("Only information previously unknown to the person to whom it is imparted may be the subject matter of a 'disclosure' under this section; i.e. you cannot 'disclose' information that is already known."); *contra Mallas v. United States*, 993 F.2d 1111, 1121, n.10 (4th Cir. 1993) (rejecting argument that no "disclosure" had occurred where plaintiff had already provided recipients with information alleged to have been disclosed by the government defendants); *but see Miller v. United States*, 66 F.3d 220, 223 (9th Cir. 1995) (declining to follow *Mallas*).  For instance, if an employer already knows a taxpayer's name and social security number, providing that information to the employer again is not "making known" anything and is thus not a "disclosure."  *Haywood*, 642 F. Supp. at 192; *see also Brown*, 755 F. Supp. at 287 (citing *Haywood*).  We find this interpretation to be in keeping with the plain meaning of the phrase to "mak[e] known."  Accordingly, in order to prove that a disclosure occurred, Plaintiff must prove that the IRS provided information to a person previously unaware of that information.

Plaintiff must also prove that the information provided was either a "return" or "return information" as defined by 26 U.S.C. § 6103.  26 U.S.C. § 7431 (a)(1).  A "return" for purposes of section 6103 means:

> [A]ny tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed.

26 U.S.C. § 6103 (b)(1).  And once again, Section 6103 defines "Return information" as:

> [A] taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense [ . . .]

26 U.S.C. § 6103 (b)(2)(A).  As demonstrated by these broad definitions, the provisions of Section 6103 cover a wide variety of information.

In this case, Plaintiff and her expert testified that the transcripts demonstrate that someone was communicating with the IRS about the estate prior to the issuance of the refund in 1990.  Based on her interpretation of the transcripts, Plaintiff theorized extensively about the types of information that were exchanged in the course of a like-kind exchange.  Although offering no conclusion on the existence of a like-kind exchange, Sullivan testified that the transactions reflected on the transcripts demonstrate that the IRS "disclosed confidential taxpayer information" in the course of processing the refund.  (11/12/2010 Sullivan Dec. ¶ 17d.)  Other than the transcripts, neither Plaintiff nor Sullivan could point to evidence of any specific communication between the IRS and the purported estate representative prior to the issuance of the refund.

Both Plaintiff and Sullivan infer too much from the transcripts, however.  Debrah Barham, an IRS employee who has reviewed over 11,000 transcripts, testified that it is impossible to discern from the transcripts alone the substance of any possible communications between the IRS and the purported estate representative.  (12/15/2010 Tr. at 74–75.)  Plaintiff's conclusion that the transcripts demonstrate that the IRS was providing various information to

facilitate a like-kind exchange is thus unfounded. Similarly, Sullivan's conclusion that

"confidential information" was "disclosed" lacks a sufficient evidentiary basis. Thus, Plaintiff

and her expert offered nothing more than mere speculation about what information the IRS

provided to the purported estate representative prior to the issuance of the refund.

Without knowing what information the IRS imparted, we are unable to conclude as a

matter of law that a "disclosure" of "return information" occurred. 26 U.S.C. § 6103(b)(2), (8).

Given the broad definition of "return information," it is possible that any discussions between

the IRS and the purported estate representative touched on "return information." But even if we

make this inference, Plaintiff has not proven that any "return information" discussed was not

already known to whoever was purporting to act on behalf of the estate. As Plaintiff's expert

indicated in his testimony, whoever this purported estate representative likely initiated the refund

process by filing certain documents, including, possibly, a corrected tax return and a claim for

refund. Anyone in possession of this information would have already known a great deal about

the estate through no fault of the IRS. It is therefore unlikely that this person learned anything

new from the IRS about the estate during the process leading up to the refund. As such, Plaintiff

has not met her burden of proving that the IRS "disclose[d]" any "return information" prior to

the issuance of the refund in 1990.

Although she did not dwell on it—perhaps because of the statute of limitations

implications discussed above—the one specific instance in which the IRS disclosed return

information was when it issued the refund check in 1990. As Plaintiff testified at trial, Scranton,

the Wirtz Corporation attorney, received the refund check in 1990. The check would necessarily

have indicated the amount of the refund—and would thus fall within the wide swath of "return

information" identified in Section 6103.  26 U.S.C. § 6103 (b)(2)(A).  But as indicated below,

Plaintiff has still failed to prove that this or any other disclosure was made negligently or

knowingly.

### 2.  Whether Any Disclosure was Unauthorized

To establish the second element of her claim, Plaintiff must prove that a disclosure of

return information was "in violation of any provision of [26 U.S.C.§] 6103[.]"  26 U.S.C.

§ 7431(a)(1).  Section 6103 establishes a general rule that "[r]eturns and return information shall

be confidential . . . except as authorized by this title[.]"  26 U.S.C. § 6103 (a).  But Section 6103

goes on to provide for several circumstances in which the disclosure of return information is

"authorized."  *Id.*  Of particular relevance to this case, Section 6103 states in pertinent part that:

> The return of a person shall, upon written request, be open to inspection by or disclosure
> to [ . . . ]
>
>> (E) in the case of the return of an estate—
>>
>>> (I) the administrator, executor, or trustee of such estate, and
>>>
>>> (ii) any heir at law, next of kin, or beneficiary under the will, of the
>>> decedent, but only if the Secretary finds that such heir at law, next of kin,
>>> or beneficiary has a material interest which will be affected by information
>>> contained therein[.]

26 U.S.C. § 6103 (e)(1)(E)(i)–(ii).  The statute also has a similar provision allowing for the

disclosure of returns and return information to the trustees and beneficiaries of a trust.  *Id.*

§ (F)(i)–(ii).  Thus, Plaintiff must show that the disclosure of which she complains was not

"authorized" in these or other ways provided by Section 6103.  *Id.* § 6103(a).

Plaintiff's primary evidence that at least some disclosures were unauthorized is the fact

that the refund was issued seven years after Wirtz's death and while the estate had no executor.

Neither Plaintiff nor her expert identified to whom any disclosure was made, however. Plaintiff speculated that a "corporate taxpayer" affiliated with Wirtz was communicating with the IRS about the issuance of the refund. On the other hand, the IRS suggested that one of Plaintiff's co-beneficiaries was pursuing the refund on behalf of the estate. Plaintiff was unable to foreclose this possibility on cross examination.

Although we find Plaintiff's elaborate corporate subsidiary theory to be overblown, there is at least some evidence that whoever was communicating with the IRS about the refund was affiliated with Wirtz. First, Plaintiff testified that she learned of the refund when Scranton, an attorney from the Wirtz Corporation, conveyed the refund to the estate's attorney. The fact that a Wirtz-affiliated attorney first received the check suggests that a Wirtz representative, perhaps Scranton himself, was soliciting the refund from the IRS. Second, given that Wirtz had been the executor and that no one had notified the IRS that he was no longer the executor, one of Wirtz's representatives would have had an easier time purporting to act on behalf of the estate before the IRS. Third, whoever sought PRP's assistance in obtaining the refund had to know of the refund's existence. Because Wirtz was still the executor of record as late as 1990, it is possible that one of his affiliates would be privy to this information. Lastly, the letter from the Illinois Department of Revenue indicates that the tax identification number 36-6047424 was affiliated with the estate of Arthur M. Wirtz. This number was also affiliated with the Watson estate in the IRS' records. Because of the apparent co-mingling of Wirtz's and the estate's accounts, one of Wirtz's representatives could have continued to receive information about the Watson estate in conjunction with information about Wirtz's estate.

Although circumstantial, this evidence supports the conclusion that one of Wirtz's

representatives continued to receive information about the estate after Wirtz's death.  26 U.S.C. § 6103(e)(1)(E)(i).  Because Wirtz was no longer executor of the estate, he nor his representatives were authorized to receive this information.  Thus, if they in fact received such information, they did so in violation of Section 6103.  *Id.* § 6103(a).  But as discussed below, there is no evidence that the blame for this violation of Section 6103 rests anywhere other than with Wirtz's unidentified representative.

### 3.   Whether the IRS "Knowingly" or "Negligently" Violated Section 6103

To satisfy the final element of her cause of action, Plaintiff must prove that the unauthorized disclosure or disclosures of which she complains were made "knowingly, or by reason of negligence."  26 U.S.C. § 7431(a)(1).  Crucially, the determination of whether the IRS acted knowingly or negligently in disclosing return information is distinct from whether the IRS' underlying conduct in tax assessment and collection was appropriate.  *Huff* 10 F.3d at 1447; *Wilkerson*, 67 F.3d at 116; *Venen*, 38 F.3d at 106; *Bleavins*, 1993 WL 265116 at * 2; *but see Rorex v. Traynor*, 771 F.2d 383, 386 (8th Cir. 1985).  The Ninth Circuit has held that, even where the IRS' "collection procedures . . . may have been defective," disclosures made in the course of those procedures will not necessarily give rise to a cause of action under Section 7431(a)(1).  *Huff*, 10 F.3d at 1447.  And as the Third Circuit has aptly concluded, "Section 6103 and its attendant damages provision, [S]ection 7431, were meant to regulate only one sphere of activity—information handling—and were 'not intended to interfere with . . . collection actions.'"  *Venen*, 38 F.3d at 106 (citations omitted).  Thus, Plaintiff must prove that the IRS' information handling in the course of issuing the refund in 1990 was knowingly or negligently unlawful, regardless of whether the assessment activity giving rise to the refund was appropriate.

-38-

At trial and in her post-trial brief, Plaintiff alternated between theories of negligent and knowing conduct on behalf of the IRS. In terms of knowing conduct, Plaintiff contended that the IRS knowingly allowed a Wirtz-affiliated corporation to claim the estate as a corporate subsidiary. (Dkt. No. 310 at 1.) Additionally, Plaintiff argued that "the corporate taxpayer succeeded in obtaining the cooperation of a problem resolution officer in creating a like-kind exchange in 1990 and making it retroactive to the 1981 tax return." (*Id.* at 3.) As indicated above, we find the factual premises of this argument to be unsound. The evidence in this case falls far short of establishing Plaintiff's corporate subsidiary or like-kind exchange theories.

But even if Plaintiff had adequately supported these theories, they still run far afield of her claim. The claim in this case pertains to the IRS' handling of confidential information. Plaintiff's corporate subsidiary and like-kind exchange theories go far beyond information handling to attack the IRS' underlying conduct in assessing and collecting taxes. Although again, we do not believe that Plaintiff has proven the rampant misconduct she alleges, Plaintiff's attempt to use a claim under Section 7431 to posit her grandiose theories about collusion between the IRS and a Wirtz affiliate is unsound as a matter of law. *Huff*, 10 F.3d at 1447; *Venen*, 38 F.3d at 106. Thus, in both law and fact, Plaintiff's claim of the IRS' knowing violation of Section 6103 fails.

Plaintiff's negligence argument is also faulty. At trial and in her post-trial brief, Plaintiff presented a theory of negligence per se based on the IRS' alleged violation of a treasury regulation providing that the "the period of administration of an estate cannot be unduly prolonged." (Dkt. No. 310 at 35 (quoting 26 C.F.R. § 1.641(b)-3(a)).) But Plaintiff's reliance on an unrelated treasury regulation to establish negligence under Section 6103 is misplaced.

As stated, suits under Section 7431 are not an appropriate vehicle to attack the IRS'

conduct in assessing and collecting taxes. *Huff*, 10 F.3d at 1447; *Venen*, 38 F.3d at 106.

Whether an estate ought to be closed for tax purposes is a question pertaining to the IRS'

conduct in assessing taxes. Indeed, the section of the Internal Revenue Code ("IRC") to which

Plaintiff's cited regulation pertains addresses how "the taxable income of an estate or trust shall

be computed." 26 U.S.C. § 641(b). Plaintiff's attempt to import this regulation in to the separate

sphere of the IRS' handling of information is misguided. Thus, Plaintiff's negligence per se

theory rests on a faulty legal premise.

But even if it were theoretically possible to use the treasury regulation cited to establish

negligence per se with respect to Section 6103, the facts of this case would not support such a

conclusion. The regulation upon which Plaintiff relies states that

> [T]he period of administration of an estate cannot be unduly prolonged. If the
> administration of an estate is unreasonably prolonged, the estate is considered terminated
> for Federal income tax purposes after the expiration of a reasonable period for the
> performance by the executor of all duties of administration.

26 C.F.R. § 1.641(b)-3(a). Plaintiff also pointed to a portion of the Internal Revenue Manual

pertaining to this regulation, which indicates that the administration of an estate "should not be

more than 5 years unless [the estate is] very large." (Dkt. No. 310, Appx. at 112.) Plaintiff

relies on these sources to argue that "the IRS should not have dealt with Wirtz on any matter

pertaining to the Watson Estate after 1966." (Dkt. No. 310 at 35.) But Plaintiff's argument

conveniently ignores several key facts.

First, the very regulation upon which Plaintiff relies also states:

> [W]here an executor who is also named as trustee under a will fails to obtain his
> discharge as executor, the period of administration continues only until the duties of
> administration are complete and he actually assumes his duties as trustee, whether or not

pursuant to a court order.

Although Plaintiff exclusively discussed the "estate" and how the IRS should have considered the "estate" terminated as of 1966, Plaintiff failed to acknowledge that Watson's will also created a trust. (Pl.'s Ex. 17 at 2–5.) Thus, even if this regulation were applicable to this case, the only significance would be to establish that the IRS should have been treating the estate as a trust after approximately 1966. This conclusion is of no moment in this case, however, because Watson's will named Wirtz as both a successor executor and trustee. (*Id.* at 4, 8.) So even if the IRS had considered the estate closed, Wirtz would still have been the acting fiduciary of the trust. In this role, he would have been entitled to receive information about the estate-cum-trust from the IRS. 26 U.S.C. § 6103(e)(1)(F). As such, Plaintiff's assertion at trial that "[m]y great uncle died in 1961[—][t]hey never should have been dealing with Wirtz" is simply incorrect. (12/13/2010 Tr. at 100.)

Second, Plaintiff failed to address the fact that no one appears to have alerted the IRS of Wirtz's ouster as executor and subsequent death in 1983. Based on the Form 5248, we know that Wirtz remained the executor on record with the IRS until at least the fourth week of 1990. (Pl.'s Ex. 30 at 2.) Plaintiff argued that the filing of the estate's final tax return in 1983 should have alerted the IRS to the fact that Wirtz was no longer executor of the estate. But this argument is incorrect as a matter of law.

Section 6903 of the Internal Revenue Code makes clear that a fiduciary retains all the "powers, rights, duties, and privileges" of a fiduciary for tax purposes "until notice is given that the fiduciary capacity has terminated." 26 U.S.C. § 6903(a). Section 6903 further provides that "[n]otice under this section shall be given in accordance with regulations prescribed by the

secretary." *Id.* § (b). The applicable regulation states as follows:

> When the fiduciary capacity has terminated, the fiduciary, in order to be relieved of any further duty or liability as such, must file with the Internal Revenue Service office with whom the notice of fiduciary relationship was filed written notice that the fiduciary capacity has terminated as to him, accompanied by satisfactory evidence of the termination of the fiduciary capacity. The notice of termination should state the name and address of the person, if any, who has been substituted as fiduciary.

26 C.F.R. § 301.6903-1(b); *see also* 26 C.F.R. § 601.505; *Tooley v. Comm'r*, 121 F.2d 350, 353–54 (9th Cir. 1941) (rejecting argument that former executor who had ceased to be executor under state law was not authorized to act on behalf of estate before Board of Tax Appeals, because former executor, who stated in petition to Board he was no longer executor, had not provided "the notice to the Commissioner required by the statute and the regulation"). Based on the requirements of this regulation, the estate's final tax return would have been insufficient notice to the IRS of Wirtz's termination as executor. In fact, on the first page of this document in a box labeled "Name and title of fiduciary," "Arthur M. Wirtz" is listed as the "Successor Executor." (Pl.'s Ex. 22 at 1.) A few lines below, there is a check-box labeled "Final return" that is marked. (*Id.*) Besides the illogicality of relying on a document naming Wirtz as the executor to prove notice that he was no longer executor, it would be quite a stretch to conclude that the mere checking of a box labeled "Final return" suffices as "written notice that the fiduciary capacity has terminated" and "satisfactory evidence of the termination of the fiduciary capacity." 26 C.F.R. § 301.6903-1(b). We decline to draw this conclusion.

The regulation also establishes that the onus was on the fiduciary to keep the IRS apprised of any changes in the fiduciary relationship. Again, it is "the fiduciary" who must file "written notice" with the IRS "that the fiduciary capacity has terminated as to him." 26 C.F.R. § 301.6903-1(b). Nothing in the regulation indicates that the IRS was under any duty to

proactively inquire in to the fiduciary relationship.  Given this regulation, we are also unable to say that the IRS should have known that Wirtz's tenure as executor ended in 1983.

In conclusion, Plaintiff has failed to prove the third element of her claim.  Through no fault of the IRS, Wirtz continued to be listed as the estate's executor with the IRS as late as 1990.  So even if the IRS made disclosures to a Wirtz representative after Wirtz's executorship in conjunction with the issuance of the refund in 1990, these disclosures were not a "knowing[]" or "negligen[t]" violation of Section 6103.  Thus, Plaintiff's claim fails on the merits.

**III.  Conclusion**

Based on our findings of fact, we conclude that Plaintiff failed to bring her claim within the time allotted by the applicable statute of limitations.  Because the statute of limitations is jurisdictional, we have no jurisdiction to rule on the merits of Plaintiff's claim.  In the event we have jurisdiction, we conclude that Plaintiff has failed to meet her burden of proof and judgment for the IRS is appropriate.

Plaintiff's claim pursuant to 26 U.S.C. § 7431 is dismissed for lack of subject matter jurisdiction.  All other claims having been resolved, this case is terminated.  It is so ordered.

Marvin E. Aspen
United States District Judge

Dated: July 26, 2011

-43-